CLOSE (LONGWORTH v.). See Case No. 8,489.

CLOSE (RICH v.). See Case No. 11,757.

---

## Case No. 2,902.

### The CLOTH CASES.

[Crabbe, 335.][1]

District Court, E. D. Pennsylvania. Feb. Term, 1840.

FORFEITURE FOR FRAUDULENT IMPORTATION.

While these cases excited much attention at the time of their trial, both from the extensive character of the frauds perpetrated, and from the general acquaintance with the parties concerned, yet, on account of the paucity of legal principles developed, and the great similarity of all the cases, it has not been thought advisable to report each in detail. The great struggle took place in regard to the cloths claimed by Taylor and the Blackburnes. This case, therefore, has been inserted at length; and a general history of the whole transaction, drawn from official sources, has been thought a sufficient notice of the other suits.

The goods in controversy in these cases, were all from the district of Saddleworth, in Yorkshire, in England, and had been entered at the custom-house by persons from that district, whose business in this country was the importation and sale of woollen goods. By far the greater portion of the cloths and cassimers of low and medium prices, imported into the United States for many years past, had been manufactured in this district of Saddleworth. It is inhabited principally, or to a great extent, by persons engaged in the manufacture of such articles. The goods made there, which are intended for the British market, are generally sold in the bank or unfinished state, at the cloth hall in Huddersfield. The goods which are finished in Saddleworth, were generally sent to this country, the local sales being so limited that the district is rarely resorted to by purchasers from other places. With occasional exceptions, this appears to have been the state of things in Saddleworth in 1838 and 1839, when the goods in controversy were exported, and for many years previous. The high rate of duties in this country on imported woollens afforded a strong temptation to persons in this Saddleworth, and their associates in this

country, to resort to measures for the evasion or reduction of their amount. The character and extent of the measures to which they resorted for this purpose, will hereafter be stated. Their effect was to drive other importers out of the market, and secure a sort of monopoly to these parties—some of whom privately declared that they could import goods at such rates as to render competition with them impossible, even on the part of skilful and experienced importers, who had partners or agents residing in England, qualified in every manner to take advantage of the most favorable opportunities of purchasing. It was testified that a member of the house of William Blackburne & Co., a partnership of whom mention will be made presently, at a time when the duties on cloths and cassimeres were not less than 41 per cent. on their value, declared that he could buy them in England, and have them delivered at his warehouse in Philadelphia, in such a manner that only 25 per cent. duty should be paid on them, and no questions asked.

Early in the summer of 1839, the attention of then collector of New York was called, by the secretary of the treasury, to reported frauds in the importation of British woollens. In the same summer the case of U. S. v. Wood [Case No. 16,751], tried at New York, and that of U. S. v. Bottomley, at Boston [Cases Nos. 1,688 and 1,689], made it a matter of public notoriety that there had existed, for years, a combination, between certain parties residing in Saddleworth, and persons from the same district who were temporary residents in this country, to pass goods through the custom-house at New York, by means of fictitious invoices, most of them representing sales of the goods to have been made by the parties abroad to those in this country, at prices greatly below the market value of the goods in England. In the case at Boston it appeared that a corrupt understanding had existed between the importer and an officer of the revenue at New York; and there was some ground to believe that the success of the fraud had been facilitated by a lax practice in England of permitting the export duty to be paid upon a fictitious representation of the value of the goods exported, which corresponded neither with their actual value on the one hand, nor on the other hand with the value or price alleged in the invoice by which it was intended that they should be entered in this country. In the case of Wood at New York, however, the developments were of an astonishing character. The father of the importer had failed in England, and his assignees, under a commission of bankruptcy, had placed the counsel for the prosecution in possession of the letters from the son relating the course of his transactions, and referring incidentally to similar transactions on the part of other importers of the same class. Of the persons whom he thus incidentally named as parties to sim-

---

[1] [Reported by William H. Crabbe, Esq.]

ilar frauds, suspicion had for some time been entertained, on evidence which had occasionally transpired in the course of investigations previously instituted. But the disclosures on this trial rendered this a matter of certainty, and pointed out distinctly the manner in which the frauds were perpetrated. The invoices on which the importations of Wood had been entered, represented as sales what were in reality mere consignments from the father to the son as an agent or partner. The correspondence not only negatived the reality of the sales, as such, but showed clearly that the pretended prices in the custom-house invoices differed from the valuations in other invoices referred to by the parties, and were, indeed, regulated by no other criterion than that which had been ascertained as the minimum standard of successful deception of the examiners in the appraiser's department, by whom goods were ordinarily passed through the custom-house.

Shortly after the decision of the two prosecutions at New York and Boston above-mentioned, the attention of persons in Philadelphia was turned toward certain commission and auction houses, of whom it was known, that their principal or entire business was the sale of goods imported into New York from Saddleworth. Private information was obtained that on a Sunday, in the early part of August, 1839, B. Broadbent, of Saddleworth, formerly an importer at New York, afterward in the employment of Mr. P. Brady, one of the agents referred to, and at that time a partner in the firm of Davis, Broadbent & Co., who were also concerned in similar agencies, had visited Jeremiah Adshead, formerly of Saddleworth, and stating his apprehensions lest the store of Davis, Broadbent & Co., should be visited and searched by custom-house officers, had requested the assistance of Mr. Adshead, who was a rapid writer, in altering the marks upon certain goods in their store. Mr. Adshead accompanied him, and assisted in making tickets with numbers different from those on the original tickets. On that day, these new tickets were, to a considerable extent, substituted for the original ones. It seems that Mr. Broadbent exercised a discrimination in altering the marks of goods received from certain importers, and leaving unchanged the marks of those received from others. It did not appear whether he used this discrimination in consequence of communications with any of the parties, or from a knowledge that some of them had already altered the marks in New York, as was the fact, or from what other reason. In the same and in the succeeding week, other goods were received by Davis, Broadbent & Co., from New York, of some of which the marks were altered in like manner. Adshead, the person who on the Sunday referred to had assisted in this operation, was one of the proprietors of an establishment to which the agents of the Saddleworth importers had been in the practice of sending cloths to be refinished, or cut and headed. With the privity of the same Mr. Broadbent, this person caused goods which had been sent to his manufactory to be secreted elsewhere. Some of these goods were placed in the upper story of a small grocery store; another portion in one of the bed-rooms of a tavern, in the cellar of which another portion was placed in an old oil cask, and covered with vegetables. Similar measures of concealment were likewise pursued by other agents of these importers. Batturs, Okie & Co., an auction house, sent some goods, of the importation of John Platt and William Bottomley, to a hardware store, with a request that they should be kept out of view. In all the places mentioned, when the officers of the customs afterward came to search for the goods, the persons in possession of them denied that they had any cloths or cassimeres in their possession. Persons privy to some of these measures of concealment, disclosed a portion of what had occurred, to parties through whom information was communicated to the district attorney, that certain goods, which had been fraudulently passed through the custom-house at New York on false invoices, were believed to be in Philadelphia in the hands of agents of the importers. He immediately made a requisition upon the collector of New York, to send to Philadelphia an officer by whom the suspected goods of New York importation might be identified. The collector of New York despatched upon this duty an officer, who arrived in Philadelphia on the 19th of August, 1839, and, under the direction of the district attorney, applied for instructions to Mr. Wolf, then collector of the port of Philadelphia. On the same day, under the direction of Governor Wolf, one thousand pieces of cloths and cassimeres, of New York importation, and thirty-one pieces, which afterward appeared to have been brought from Canada, and entered at Rouse's Point, were seized at the store of Davis, Broadbent & Co. Two days afterwards, on the 21st of August, a visit was made, by officers of the revenue collection service, to the store of William Blackburne & Co., in the same neighborhood. William Blackburne & Co. were the principal receivers and sellers in this city of goods which John Taylor, Jr., imported to a large extent through New York. John Taylor, Jr., was of Saddleworth, and received his importations thence through Abel & Thomas Shaw, a son of whom was a member of the firm of William Blackburne & Co., and to whom all the other members of this firm were related or connected by marriage. Mr. Taylor also received some goods from other parties in England. His annual importations were of very large amount. It appeared that Mr. Blackburne rented a store in Church alley, No. 24, in Philadelphia; that the adjoining store, No. 26, was rented by Mr. Worrell, and

that the lower, or ground story, was occupied by him. The second story or floor of this store, which extended over the whole building, was in the occupancy of Mr. Blackburne, and the access to it was by a large opening or doorway from Mr. Blackburne's second story into it. This door was usually kept open, and was so in July and August, 1839, and up to the 20th of August, on the day when the seizure was made. On the morning of that day, the porter of Mr. Blackburne saw in a newspaper, or was informed by somebody, that a seizure had been made of Mr. Broadbent's goods. Whether Messrs. Blackburne had the same information or not, did not appear. On the same morning, the hour was not precisely fixed, at about eight or nine o'clock, this door or passage was completely blocked up, and concealed by boxes, &c., so that persons going into Mr. Blackburne's second story, saw nothing by which they could discover or suppose there was any communication between the two rooms. The officers on their first visit did not discover it; they went away; but on getting further information, they returned, and by introducing a stick between the boxes, they found where the passage was, removed the obstructions which concealed it, and went into the adjoining room. It was entirely dark, although Mr. Blackburne's porter says he had opened one of the windows that morning. In this room the goods in question were found, some in their cases, some lying on them. When the officers first came to Mr. Blackburne's second story he was there. They told him their business; he said they might search. He said he had no goods in his possession but what were imported through the port of Philadelphia. The officers examined the cloths and cassimeres in the lower story, and then went up stairs of store No. 24. After looking at some cloths and cassimeres there, one of them asked Mr. Blackburne if they were all the cloths in his possession. He answered, "Yes, you have seen all." He was asked if he had no other store in the neighborhood. He answered, "No, you have seen all that we have." The officer did not on this visit discover the passage into the next store. They returned in the afternoon. One of them said to Mr. C. Blackburne that they wished to see the second story over Mr. Worrell's store. He replied, "You have seen all the rooms that we have." The officers went up stairs and searched for the entrance into the next room. He denied that there was any access to that room. They proceeded in their search to discover one, and at last he said, "The entrance is behind those boxes." The officers were thrusting a stick between the boxes. In the next room the goods were found, and Mr. Blackburne said he was the owner of them. The goods of New York importation, thus found concealed at W. Blackburne & Co.'s, seven hundred and thirty-nine pieces, were, of course, seized. On the next day an additional seizure was made

at P. Brady's, of five hundred and fifty-eight pieces of New York importation, which had been received on consignment from parties, most of whom had consigned other portions of the same importations to Batturs, Okie & Co., or Davis, Broadbent & Co. Besides the seizure at Davis, Broadbent & Co.'s, Blackburne's, and Brady's, one hundred and sixty-nine pieces were found, in small lots, in the hands of other agents of the importers, and one hundred and seventy-six pieces in the hands of parties who afterwards alleged that they were purchasers of the goods for a valuable consideration. The whole quantity of cloths and cassimeres seized in August, 1839, was twenty-six hundred and seventy-three pieces, all from Saddleworth, of which it is believed that twenty-five hundred and eighty-four pieces had been imported into New York, fifty-eight pieces into Philadelphia, and thirty-one pieces, imported through Rouse's Point, had been originally brought into Canada.

Informations were filed in due course, alleging as causes of forfeiture, under several different counts, what may be resolved into the substantial charge of the goods having been falsely invoiced with intent to defraud the revenue. To the goods thus libelled forty-four several claims were interposed, under which as many distinct issues were joined. The parties making these forty-four claims were twenty-four persons, some of whom claimed goods at each of two or more different places. The result of the trials as to the twenty-five hundred and eighty-four pieces of New York importation was, that as to twenty-three hundred and forty-two pieces there were verdicts for the United States. Of the remaining two hundred and forty-two pieces, there were entries of nolle prosequi as to one hundred and twelve pieces in one case, and two pieces in another case. In regard to these one hundred and fourteen pieces, the claimants offered to admit on the record that there was probable cause for the prosecution; and the district attorney did not think that the evidence on the part of the United States, would have justified the asking for more than a certificate to this effect. It certainly was not so strong as to warrant the urging the condemnation of the goods. As to one hundred and eighteen pieces, embraced in nine cases, in each of which they formed a portion only of the goods in controversy, there were verdicts for the defendants, with a certificate of the court that there was probable cause for the prosecution. Of the fifty-eight pieces believed to have been imported at Philadelphia, forty-two pieces were condemned, and sixteen pieces acquitted, the court certifying, as to the latter, that there was probable cause for the prosecution. The thirty-one pieces imported through Rouse's Point, were the subject of a correspondence between the deputy collector at that place, and the late collector at New York. The person who had entered them

was the same party claimant of one hundred and twelve pieces imported at New York, as to which a nolle prosequi had been entered as above; and upon an examination of the correspondence and other papers exhibited on his behalf, it was considered a proper case for a similar discrimination in his favor. Probable cause for the prosecution being admitted in like manner on the record, a nolle prosequi was, therefore, entered as to these thirty-one pieces, with the sanction of the court. The goods consigned to Philadelphia, were usually selections of parts of several importations; and, in most cases, portions of them had been sold, leaving on hand the goods in controversy. These goods had, in many instances, been so long in this country, that if really bought for exportation, according to the tenor of the invoices, the prices of them must have been remitted to England. Correspondence and accounts must, therefore, have been interchanged with persons in England, as well as with persons in Philadelphia. Before the trials, the counsel of the United States, adverting to these circumstances, gave timely notice to the several parties to produce all invoices, correspondence, accounts, and books of account, with the parties in England, from whom the goods in question purported to have been received. Under these notices, various calls were made, during each of the contested trials, for particular accounts and documents; of some of which. the existence and possession by the defendants were distinctly proved. These calls were not, in a single instance, responded to by the production of a letter, voucher, or other paper, or of a book containing an original or other account of their pecuniary transactions with the parties in England, and no excuse was given for withholding them.

The first case tried was that of a claim interposed by John Taylor, Jr., and William Blackburne & Co., to the goods concealed as above at William Blackburne & Co.'s, Mr. Taylor alleging himself to be the owner and importer, and William Blackburne & Co., as his factors, alleging that they had advanced to him fifty-nine thousand dollars upon the goods. Upon the trial, the United States proved the concealment of the goods, and attendant facts detailed above, and proved a variety of circumstances tending to show that Taylor was not really a purchaser of the goods in the fair and proper sense of the term, but had received them under some secret understanding or arrangement, the result of a combination between him and the parties in England, under which the goods of his importation were invoiced at prices lower than those of the English market. It was also proved by importers of cloths and cassimeres, as to the goods in question, that the prices mentioned in the invoices were generally much lower than those ordinarily paid by purchasers in England at the same period. There was other evidence tending to prove that there were fictitious deductions inserted in the invoices. A point was raised and insisted upon, as will be seen in the following report of the case, that the goods having been passed through the custom-house at New York, and duties assessed and paid on the footing of the invoices being correct, it was afterwards too late to allege the contrary as a cause of forfeiture. As regarded the law of the question, it was a sufficient answer, that if the invoice on which the importer had obtained a permit for his goods was a false one, and had been the means of practising a deception upon the officers who had passed the goods, the fraudulent party should not be allowed to take advantage of his own wrong, and rely upon the fraud itself as a shield and protection against the penalties imposed upon the very act on which he relied for his immunity. Of this opinion was the judge. He left the facts to the jury, who, after a protracted trial of several weeks' duration, returned a verdict for the United States. Shortly before this trial, some of the claimants had obtained at New York, from Chancellor Kent, an opinion, which was circulated extensively through the newspapers, that "when the duties have been paid and the goods fairly passed through the government offices into the general mass of the circulating commerce of the country," the collector had no right to seize goods for any of the causes of forfeiture set forth in the revenue collection acts. The context of that part of his opinion which contains this important word "fairly" was, by many persons, supposed to indicate the opinion of this eminent jurist, that a permit, though obtained by fraud, would operate as an irrevocable exemption of the goods from prosecution for any forfeiture previously incurred. This can scarcely have been his meaning; because, thus understood, his opinion would be opposed to the whole course of judicial decisions on the subject. Nevertheless, this view of the law had been pressed with such earnestness, that, after the trial, the judge acceded to a request on behalf of the claimants that the trials of the remaining cases should be postponed until after a decision of this point by the supreme court. After this, no case involving this precise point under the same enactments on which the informations were framed, came before the supreme court, until it was decided in Wood v. U. S., 16 Pet. [41 U. S.] 342.

The opinion of the supreme court, delivered on the 7th March, 1842, resolved the doubt, if there ever was one, upon this subject. The court said: "The second instruction of the court is, in effect, that if the invoices of the goods now in question, were fraudulently made, by a false valuation to evade or defraud the revenue, the fact that they had been entered. and the duties paid or secured at the custom-house at New York upon those invoices, was no bar to the present information. This instruction was certainly correct,

if the sixty-sixth section of the revenue collection act of 1799, c. 128 [1 Stat. 677], now remains in full force and unrepealed: for it can never be permitted that a party who perpetrates a fraud upon the custom-house, and thereby enters his goods upon false invoices and false valuations, and gets a regular delivery thereof upon the mere payment of such duties as such false invoices and false valuations require, can avail himself of that very fraud to defeat the purposes of justice. It is but an aggravation of his guilt, that he has practised imposition upon the public officers, as well as perpetrated such a deliberate fraud. The language of the sixty-sixth section completely covers such a case. It supposes an entry at the custom-house upon false invoices, with intent to evade the payment of the proper duties, and the forfeiture attaches immediately upon such an entry, upon such invoices, with such intent. The success of the fraud in evading the vigilance of the public officers, so that it is not discovered until after the goods have passed from their custody, does not purge away the forfeiture; although it may render the detection of the offence more difficult and more uncertain. The whole argument turns upon this, that if the custom-house officers have not pursued the steps authorized by law to be pursued by them, by directing an appraisement of the goods in cases where they have a suspicion of illegality, or fraud, or no invoices are produced, but their suspicions are lulled to rest, the goods are untainted by the forfeiture, the moment they pass from the custom-house. We cannot admit that such an interpretation of the objects or language of the sixty-sixth section, is either sound or satisfactory." Nearly two years had elapsed since the trial of the case against John Taylor, Jr., when this decision of the supreme court removed every obstacle to the trial of the remaining cases upon their fair merits. The report of most of them, however, would consist in stating that, on the examination and appraisement of the goods by persons conversant with the British markets, they had been found greatly to exceed in value the prices stated in the respective invoices; that the proceeds of goods of the same importations, sold before the seizure, had been such as more than verified the accuracy of the appraisements of the goods in controversy; that a similar confirmation was found in the limits affixed to the goods in controversy on their transmission to Philadelphia for sale, after making full allowance for the largest difference between limits and actual sales, apparent on a recurrence to the accounts of previous transactions through the agents in Philadelphia. In some cases it appeared that the prices of importation of goods received after the seizure had been considerably higher than those of previous importations, received by the same importer from the same parties in England, and there were cases where it also appeared that goods on their

way from England to this country at the time of the seizure of the goods in question, were not entered upon the original invoices, but were allowed to remain several months in the public stores until new invoices were obtained from England, and were then entered at prices considerably higher than those of previous importations. In most of the cases the parties or their agents had resorted to concealment or other artifices, of the character of some of which a description has been already given. In all the cases it was fully in proof that the particular importations in question were not isolated or distinct transactions, independent of or unconnected with others, but were parts of a connected series of importations made under some general contract or arrangement.

The case of Joseph Wrigley at first appeared to involve peculiar considerations. A widowed mother, two daughters, and three sons, in Saddleworth, were said to have derived their support for about 20 years from doing journeywork in different branches of the woollen manufacture. The mother died in 1836 or 1837, and the sons, in partnership, continued the business in which they had been engaged in her lifetime—which was making cassimeres,—by doing a part of the work themselves, and getting the other parts of the manufacture performed by artisans in the neighborhood, as they could afford to pay for it—some of the members of the family working in the mean time, at intervals, for neighboring manufacturers. In January, 1839, the importer of the goods in question came to the United States, when it was arranged that the former establishment of the family should be broken up. Of the daughters, one married, and the other left the family residence. The other two brothers were to remain in partnership at the homestead, with a portion of the mother's furniture and effects, for which they were to be charged, and the rest were to be sold at auction. The brother who came to America left behind him his share of these effects, and a sum of money, in the hands of the two other brothers, the whole amount of which, except a small invoice of shawls, which he took out with him, was to be worked up into cassimeres, which he was to receive at the cost of manufacture, in payment of what should be found due to him upon the settlement of the concern, which was to take place after his departure. Accordingly, in April, 1839, an invoice was made out of 17 pieces of black cassimere, as sold by one of the brothers in England to the brother in this country, by whom they were entered, and passed through the New York custom-house, on the 28th May following, as purchased goods. Of these 17 pieces, 14, seized in August, 1839, at Davis, Broadbent & Co's., where he had placed them for sale, formed the subject of controversy. In October, 1839, the two brothers who had remained in Saddleworth, dissolved their partnership. One of them

came to this country, and was sworn for the importer as a witness, to prove the entire fairness of the transaction, and the impossibility that there could have been any fraudulent motive in respect to the revenue. He proved the transactions, of which the above is an outline, and positively swore, that, except the shawls, there had been no goods previously sent by them to America. There were, however, many circumstances which attracted suspicion, and rendered necessary an extended and careful cross-examination of this witness. In the first place the goods were invoiced, certainly sixty per cent., and probably seventy-five per cent., below their market value, and doubtless, greatly below even their cost of production, to the brothers in England, who were the alleged manufacturers. The circumstance of these two brothers having continued their business on that side of the water, until the time when the news of the seizure of these goods would regularly have reached them, and having then abruptly closed it, compared with the fact that the package in which these goods were imported, was numbered W 100, and that the number 2,300, on the first piece of the goods contained in it, answered to an ordinary average of 23 pieces to a package; and that the shawls which he had brought with him, were in a package marked W 99, furnished strong ground for the belief that these importations were part of a connected series, of which 98 more or less had preceded the one in question; and more would have followed had not the course of business been arrested by the seizure. In cross-examination, the witness professed the most entire ignorance of everything relating to the goods, and to the business in which he had been a partner, alleging that he and the importer had always left everything like writings, accounts, and calculations, to their brother, who was still at home; and that he himself was so ignorant, as not to know the cost of a single process of the manufacture, although he had himself received wages in one of the processes at which he had worked in the neighborhood. As the cross-examination proceeded, however, it appeared that he had known the name of the ship-broker at Liverpool, and other matters not entirely reconcilable with such entire ignorance. He was closely questioned as to the handwriting of his two brothers. That of the importer, ascertained by his entry and signature of the oath annexed to it, was pointed out to him as on papers which he had said were written by the other brother now in England. Upon this he said that he was not sure which of them had written what was shown to him, but that the latter had usually made out the invoices.

On following rapidly with the questions, which naturally arose upon this observation, it appeared that for many years, in the lifetime of the mother, and subsequently, the family had been in the habit of occasionally sending goods to this country, some or all of which had been sold here for them, as he said, by an importer of Saddleworth, residing in New York, who had accounted to them for the proceeds. The whole theory of the supposed accidental character of the importation in question was thus destroyed, and the attempted explanation of the manner in which such low prices had been inserted in it, and of the reason for giving the transaction the form of a purchase, entirely failed. The court left to the jury the question whether they believed the invoice to have been made out at low prices with intent to evade the payment of a part of the duties to which the goods were justly liable, saying that if it was really a sale as between the parties, the small amount of the price was otherwise no cause of forfeiture. Under this instruction the verdict was for the United States. This case is since divested of all doubt, and therefore of all sympathy, by the ascertainment of what might have been anticipated from the evidence on the trial, viz.: that the same party in New York who was testified by the witness to have previously received consignments for account of this family, had in 1838 entered as sold by them to him at least two previous invoices of packages marked W 96 and 97, and it is highly probable that other importations of the series with this mark could be traced on a further examination in the custom-house at New York.

Another case, in which evidence of the actual purchase and price of the goods was offered, was that in which James Mallalieu was the claimant. The goods imported by him were invoiced as sold to him by different persons, four of whom were examined under a commission. Two were his brothers, the other two his brothers-in-law. Each of them testified that the respective goods were actually sold to him at the prices mentioned in the respective invoices, nine in number, which bore date at different periods in the winter and spring of 1838, '39, and that the witness had no interest, direct or indirect, in the goods or their proceeds, and had received the prices mentioned in the respective invoices, but had not received, and was not to receive anything more. In the interrogatories in chief, each witness was asked to "state under what contract or order from the said claimant, if any, or under what arrangement, if any, the said bale or bales of goods were sold or purchased," and to "state the manner of the sale or purchase as aforesaid of such goods, and whether for cash or on credit," &c.; and as to any verbal contract, order or arrangement, to which he might testify, was in a cross-interrogatory requested to state whether he was in person present when it was made, &c. In answer to these interrogatories, each witness testified that the goods mentioned in the respective invoices were sold upon credit, under a verbal contract made by the claimant with each of

them personally some time before the dates of the invoices. It was clear that at these dates the parties were three thousand miles apart, and that the alleged antecedent verbal contract, made when they were together, was a general one, not applicable specifically to the particular goods in question alone. Yet neither witness testified what were its terms or conditions, or even stated on what credit the alleged sale under it was made. Two importers of New York, each of whom had passed a great portion of the last five years in England as a purchaser of Yorkshire cloths and cassimeres, two importers of Philadelphia, who had been in Yorkshire, and bought such goods there in 1839, another who for twenty years had had a partner residing in England, engaged in the same business, from whom he had been constantly receiving importations, and two others, who, without having been in England, had been importing with great facilities, and opportunities for doing so to advantage, in all, six experienced and skillful persons, together with the official appraisers of this port, had concurred in appraising these goods at rates from which it appeared that they were invoiced forty-five per cent. below their market value in Yorkshire, at the time of exportation; and upon evidence of the actual cost of the materials and wages required to produce them in England, it appeared that they exceeded the prices of the invoices, exclusive of any allowance for rent, taxes, wear and tear of machinery, superintendence, manufacturer's profit, forwarding, warehouse rent, interest, &c. It appeared that other goods included in the same invoices, had been sold in Philadelphia by the piece, with the factor's guarantee of sale, at an advance of one hundred and fifty-six per cent. on the prices mentioned in the invoices on which they had been imported, at a time when the ordinary advance on the invoice was eighty to eighty-five per cent., or about ten per cent. beyond cost and charges. The importer, Mallalieu, had come to this country in November, 1838, to succeed, as a resident at New York, a person, who, having returned to England in December, 1838, was one of the exporters by whom a portion of the goods in question were afterwards invoiced to him from England. It appeared that Mallalieu, while in England, had been in the practice of forwarding goods to this person in New York, in the same manner as sold by him, and that they had been entered accordingly, as purchased goods. These goods were in part traced to the hands of the factor, by whom they had been disposed of in Philadelphia, in the previous year, 1838. In that year goods of this description, fairly imported, had not commanded more than a barely saving price, say 75 to 80 per cent. advance on the invoice. Yet these goods sent out by Mr. Mallalieu, had commanded an advance of 126 per cent. on the prices at which he purported to have sold them, according to

the tenor of invoices in his own handwriting, on which they had been entered by his brother-in-law, the alleged purchaser. A variety of other circumstances combined to induce a belief that the persons invoicing and receiving these goods, were concerned in a combination to defraud the revenue, of which these invoices of pretended sales were the machinery. This belief became equal to a conviction, on a careful examination, and comparison of the numerous invoices of all his importations. The numbers upon the goods were scattered in each invoice, in such confusion, as to indicate the reverse of any regular or progressive series. But, on arranging them in numerical succession, it appeared that the numbers on these goods, thus purporting to be bought at different times and places, from different persons, each of whom testified that he had no knowledge of any of the sales, other than those made by himself, formed parts of consecutive ranges of numbers, in which the goods of each party were connected in every possible form with those of each of the others. This coincidence was strengthened by the circumstance, that the numbers were not in a single progressive range, but formed a succession of ranges, with gaps or intervals, sometimes of several hundreds or thousands, each man's invoices taking a new start in each new succession or range of numbers. As each witness had sworn that he was himself the manufacturer, and had, himself, packed the goods for exportation, it was impossible to allege that a subsequent agent of the importer had placed the marks upon them; and an almost equally decisive negative was found in the circumstance, that in very many instances, the numbers which formed the subject of consideration, were not upon the tickets attached to the goods alone, but even the list number, or original weaver's mark, in many instances, corresponded with the ticket number. In this, as in the other cases, notice had been given to produce the party's books and papers, which were as usual pertinaciously withheld. The defendant's witnesses having stated that a bill of exchange had been remitted for the amount of each invoice, a call was made for the thirds of exchange of each of the party's remittances to the alleged sellers, but none were produced. However painful the result, the conscientious convictions of the jury compelled them to disbelieve the testimony of the witnesses under the commission. It is also to be observed, that the testimony produced under the commissions to Saddleworth, was apparently entitled to but little credit, because of the evident collusion and connexion between the witnesses. The words used, the forms of the answers, and even the method of evasion, being in many cases identical. In some of the cases, there was this difference, that while the invoice prices of certain of the goods were greatly below the appraisements, those of others were not at all below, or so little

below them, as scarcely to justify the counsel of the United States in insisting upon the prosecution. A proposal was made on behalf of these parties to withdraw all opposition to the condemnation of those goods of which the appraisements materially exceeded the invoice prices, if it could be understood that the prosecution would not be pressed as to the others. The counsel of the United States replied, that if the books and accounts of the parties could be exhibited, and appeared to be fair, a nolle prosequi would be entered in each case as to the whole. The counsel of the claimants, not being authorised to exhibit the books and accounts, the counsel of the United States determined to insist upon the prosecution, as to all goods which were appraised more than ten per cent. above the invoice prices. On announcing this determination to the counsel of the claimants, they declined opposing any defence as to such goods, and submitting as to these to a verdict for the United States, contented themselves with asking a verdict of acquittal as to the others. In this manner a few pieces were acquitted, the court, in every such instance, certifying that there was probable cause for the prosecution.

In all the cases, except two, it was an undisputed fact, that the goods in controversy were still in the hands of the original importers, or their immediate agents. But two parties, namely, James Lynd, Jr. & Co., and Daniel Deal & Co., pleaded in bar of the informations, that they were purchasers of the goods claimed by them, respectively, for a valuable consideration, without any notice of the frauds of the importers. This plea was in neither case tenable in point of fact, as will appear presently. But, if true in fact, it could not avail the defendants in point of law. The plea in each case was, therefore, demurred to, and the demurrers were sustained by the court, on the authority of Wood v. U. S., 16 Pet. [41 U. S.] 342, and previous decisions of the supreme court. Wood v. U. S. arose upon an information similar to the informations in question. On page 362, the court say that the 66th section of the act of 1799 [supra] "supposes an entry at the custom-house upon false invoices, with intent to evade the payment of the proper duties, and the forfeiture attaches immediately upon such an entry upon such invoices with such intent." And again, on page 365, that, under this section, "the forfeiture immediately attaches to every entry of goods falsely and fraudulently invoiced." In Gelston v. Hoyt, 3 Wheat. [16 U. S.] 311, upon a question under the act of 1794 [1 Stat. 383], imposing a forfeiture of a vessel fitted out and armed, to be employed in the service of a foreign state hostilely against another foreign state, it was held to be the doctrine of the English courts, which had been previously recognised and enforced by the supreme court of the United States, that the forfeiture attached at the moment of the commission of the offence, and that the title of the party incurring it was completely divested from that moment. The previous decision referred to was U. S. v. Certain Bags of Coffee, 8 Cranch [12 U. S.] 398, where it was decided that the forfeiture of goods for the violation of the non-intercourse act of 1809 [2 Stat. 529] took place upon the commission of the offence, and avoided a subsequent sale to an innocent purchaser, although the duties had been paid, and the goods delivered under a formal permit. Thus the language of the court in 16 Pet. is traced back to a case in which the forfeiture was held to defeat the title of a purchaser. In delivering judgment on the demurrer, the court relied on these authorities, and cited English decisions to the same effect. But neither of the two cases in which this point arose, were instances of purchases, in the proper sense of the term. To constitute a party a purchaser, entitled as such to protection against what would be otherwise a better title, it is indispensable at law, and in equity, that the price or consideration should have been paid away and absolutely parted with before notice of the adverse claim. In one of the cases, James Lynd, Jr. & Co., the alleged purchasers, had bought the goods from William Blackburne & Co., on terms of credit which, as to about two-thirds in value of the sales, had not expired when the seizure was made, and, shortly before the seizure, had failed in business, indebted to William Blackburne & Co., the alleged sellers, in an amount greatly exceeding the price of the whole of the goods. The real parties interested were, therefore, William Blackburne & Co. and John Taylor, Jr., the importers, whose fraudulent practices in reference to the revenue, were not denied or deniable. The other case was that in which Daniel Deal & Co., the claimants, alleged themselves to have been purchasers of the same John Taylor, Jr., and William Blackburne & Co. Here, however, no part of the price had been paid for any of the goods.